IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RED CLAY CONSOLIDATED SCHOOL | : | C.A. 10-784-RGA |
| DISTRICT, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| T.S. and R.S., | : | |
| as parents of J.S., | : | |
| | : | |
| Defendants. | : | |

## **MEMORANDUM OPINION**

---

James J. Sullivan, Esq., Wilmington, Delaware; Jeffrey Klamut, Esq. (argued),
Philadelphia, Pennsylvania; Attorneys for Plaintiff Red Clay Consolidated School
District.

Neil R. Lapinski, Esq. (argued), Wilmington, Delaware; Attorney for Defendants T.S.
and R.S., as parents of J.S.

---

September $\underline{26}$, 2012
Wilmington, Delaware

1

_Richard G. Andrews_

**ANDREWS, United States District Judge:**

Plaintiff Red Clay Consolidated School District filed this motion for summary judgment to overturn the Delaware Department of Education Due Process Panel's split decision in the matter of *J.S. v. Red Clay Consolidated School District*, DE DP 10-03 (July 2010). The Due Process Panel held that the School District denied J.S. his right to a free and appropriate public education ("FAPE") under the Individual with Disabilities Education Act ("IDEA"). The Panel awarded J.S. compensatory educational services. Defendants T.S. and J.S. ("Parents") are the parents of J.S. and oppose the summary judgment motion on his behalf. Parents also request that the School District fund J.S.'s private placement at Our Lady of Confidence School in Montgomery County, Pennsylvania.

## BACKGROUND

At the time the due process complaint was filed, J.S. was a 13-year-old seventh grade student with Down Syndrome, mild bilateral hearing loss, nystagmus and celiac disease. Tr. at 62. J.S. attended the Meadowood Program in the Red Clay Consolidated School District. Tr. at 11. The Meadowood Program is designed to develop the functional life skills of special needs students in order to facilitate adulthood independence. Tr. at 21-23. The program maintains a teacher-student ratio of one to six with two to three certified paraprofessionals per class. Tr. at 60. J.S.'s IQ has been assessed at the 0.1 percentile for children his age. Tr. at 88-92. He uses a voice output device ("VOD") to assist communication. Tr. at 1114.

Parents became dissatisfied with J.S.'s rate of academic progress at Meadowood and filed a due process complaint against the School District on December 22, 2009. Tr. at 1382. Parents alleged that J.S.'s right to a FAPE was not being met according to the requirements of

2

the IDEA. Tr. at 1387. Specifically, Parents objected to Meadowood's formulation and implementation of sixth and seventh grade Individualized Education Plans ("IEPs") for J.S. Tr. at 1387. They requested that the District pay for private school placement at Our Lady of Confidence School. Tr. at 1387. A due process hearing was held before a three-member Panel. Tr. at 1382. At this hearing, the Panel considered the following issues: (i) whether the District failed to provide J.S. with appropriate IEPs for the 6th and 7th grades; (ii) whether the District failed to implement these IEPs properly; and (iii) whether the District failed to provide meaningful educational benefits to J.S. Tr. at 1387.

On July 16, 2010, the Panel issued a 2-1 split opinion, holding that the School District denied J.S.'s right to a FAPE. Tr. at 1393. Specifically, Meadowood created IEPs that failed to provide J.S. with a "cohesive educational plan during his 6th and 7th grade years." Tr. at 1392. The Panel awarded compensatory education in the form of math and reading specialists. Tr. at 1392. The Panel denied Parents' requested private placement, noting that the District had recently developed a program that would meet J.S.'s needs. Tr. at 1392. On September 15, 2010, the School District filed this action pursuant to 20 U.S.C. §1415(i)(2) seeking judicial review of the Panel's opinion that J.S. was denied his right to a FAPE. (D.I. 2). Parents filed an answer with counter-claims seeking reversal of the Panel's decision to deny J.S. private placement. (D.I. 6). The District filed its motion for summary judgment in support on May 17, 2011, to which Parents have responded. (D.I. 31; D.I. 41). This Memorandum Opinion will explain the Court's resolution of these disputes.

## LEGAL STANDARD

Under the IDEA, J.S. is entitled to a FAPE. 20 U.S.C. § 1409(9) & 34 C.F.R. § 300.17. To ensure the appropriateness of the education provided, the IDEA requires school districts to form IEPs that implement instructional programs tailored to the special needs student's ability and skills. *J.D.G. v. Colonial Sch. Dist.*, 748 F. Supp. 2d 362, 367 (D. Del. 2010). An IEP must "consist[] of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 589 (3d Cir. 2000). IEPs must be "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004). To determine whether a district has complied with the IDEA, the relevant inquiries are: "First, has the State complied with the procedures set forth in the Act? And second, is the [IEP] ... reasonably calculated to enable the child to receive educational benefits?" *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982).

If the parents of a disabled child do not agree with the IEP offered by a school district, they may request a due process hearing. 20 U.S.C. § 1415(f)(1). Any party "aggrieved by the findings and decision" of the administrative hearing may appeal the decision to a state educational agency. 20 U.S.C. § 1415(g). If a party disagrees with the final result of the administrative review process, the party may appeal that result to the District Court. 20 U.S.C. § 1415(i)(2)(A). The party challenging the IEP carries the burden of proof. *Greenwood v. Wissahickon Sch. Dist.*, 2006 WL 279085, at *1 (E.D. Pa. 2006). This Court applies a "modified *de novo*" standard of review to the administrative panel's decision. *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). This requires the Court to give "due

4

weight" to the factual findings of the administrative panel, meaning they are considered *prima facie* correct. *Id.* Where this Court declines to adhere to those factual findings, it must explain why. *Id.*

## DISCUSSION

The appropriateness of an IEP is determined with an analysis that carefully considers the student's individual abilities. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 248 (3d Cir. 1999). J.S. was credited with an IQ test score of 40 on the Wechsler Intelligence Scale for children. (D.I. 34, Exh. A at 9). This placed him in the bottom .1%, or the "Extremely Low" range of intellectual functioning ability. (*Id.*). J.S. was further assessed to have a non-verbal IQ score of 43 on the Stanford Binet Fifth Edition Assessment. Tr. at 1037. Parents argue that the District failed to provide J.S. with a FAPE for the following reasons: (i) J.S. failed to progress academically in a number of skills and subjects (D.I. 41, pp. 4-10); (ii) the District failed to include baseline data in the IEPs from which to measure J.S.'s progress (*Id.* at 15-16); (iii) the District failed to provide a cohesive curriculum with sufficient variation (*Id.* at 16-19); (iv) the District failed to appropriately integrate J.S.'s voice output device with his classes (*Id.* at 19); (v) the District failed to conduct a Functional Behavioral Analysis and a Behavioral Intervention Plan (*Id.* at 10-13); (vi) the District failed to afford J.S. with an education in the least restrictive environment (*Id.* at 13-15); and (vii) the District failed to afford J.S. a reading specialist. (*Id.* at 20). The parties also dispute whether Parents' expert report is admissible. These arguments are addressed in turn.

**(a) J.S.'s Failure to Progress.**

Parents begin by pointing to J.S.'s lack of progress, arguing, "If J.S.'s progress toward mastery was *de minimis*, J.S.'s 6th and 7th grade IEPs were not reasonably calculated to provide meaningful benefit, and, thus J.S. was denied FAPE." (*Id.* at 4). J.S.'s failure to progress with the use of his VOD, and his failure to improve in math, writing, and reading are specifically mentioned. Essentially, Parents take the position that an IEP is only appropriate when the student shows academic progress over the school year of its implementation. This is an incorrect statement of the law. There is no requirement that the child actually show educational improvement as a result of the educational program. *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 180 (3d Cir. 1988). An IEP is not judged by an after-the-fact review of a child's performance, augmented with the benefit of hindsight. The IEP must be viewed through the prism of what was known at the time it was created: "[A]n individualized education program ("IEP") is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." *Fuhrmann on Behalf of Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3d Cir. 1993) (citations omitted). It is true that an IEP must be formulated with the expectation that it will confer more than a trivial or *de minimis* benefit on the student. *Polk*, 853 F.2d at 180. Whether the IEP was actually calculated to achieve that goal, however, is not to be judged at some later date when one has the benefit of the child's actual experience.[1] *Fuhrmann*, 993 F.2d at 1041. Thus, Parents' argument that J.S.'s failure to progress compels a finding that the IEPs were inappropriate is misplaced.

## (b) The Lack of Baseline Information in the IEPs and the IEPs' Capacity to Measure Progress.

[1] Evidence of actual progress, however, is relevant to a determination of whether the challenged IEP was reasonably calculated to confer some educational benefit in certain circumstances. *Coale v. State Dept. of Educ.*, 162 F. Supp. 2d 316, 331 (D. Del. 2001).

6

Parents next argue that the Panel correctly found that J.S.'s sixth and seventh grade IEPs lacked historical data concerning his past educational programs, which led to the conclusion that the IEPs did not make it possible to measure J.S.'s progress over time. Although the IDEA does not require that a student demonstrate actual progress, it does require that an IEP set "measurable annual goals relating to both progress in the general curriculum and additional educational needs arising from her disability." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 264 (3d Cir. 2003). In its decision, the Panel held that the IEP team established goals without regard to what transpired during J.S.'s previous years of education. Specifically, the Panel pointed out that Angela Profita, J.S.'s sixth grade special education teacher, failed to cross-reference J.S.'s fifth grade sight word list with the word list to be learned in sixth grade. Therefore, it was impossible to know whether the sight words that J.S. learned in sixth grade were duplicative of already mastered material. The Panel also criticized the math component of J.S.'s IEPs, finding that they were overly repetitious, making it impossible to tell whether J.S. was relearning mastered skills or showing actual progress. According to the Panel, these flaws rendered the IEPs ineffective. The Panel also concluded that there was no persuasive showing of actual progress during the school years in question.

The Court holds that the Panel's findings are not supported by the record. J.S.'s educational history was in fact considered during the formation of the sixth and seventh grade IEPs. Ms. Profita coordinated with J.S.'s fifth grade and summer school teachers in planning the sixth grade IEP. Tr. at 185-86. Ms. Profita gave J.S.'s fifth grade IEP itself "great consideration" in planning the sixth grade IEP and reviewed it with both the fifth grade teacher and J.S.'s mother. Tr. at 131, 183. Although the Panel stated that J.S.'s IEPs were created with little regard to his educational history, Ms. Profita testified that the sixth grade word list marked

7

a purposeful change in direction from the previous year. Tr. at 183. The fifth grade list focused heavily on words used in J.S.'s inclusion classes. Tr. at 183. Ms. Profita responded to perceived weaknesses in that year's IEP by crafting the sixth grade list to emphasize functional words. Tr. at 183. She admitted that she did not cross-reference word lists to ensure that no mastered words carried over into the sixth grade IEP. Tr. at 199-200. Any harm from this omission was diminished by the measuring of J.S.'s Present Level of Educational Performance ("PLEP"), which showed that J.S. could identify only six out of 50 words on the sixth grade list. Tr. at 185. Common sense dictates that J.S. would have identified a much higher percentage if the list was truly tainted with already mastered words. Further, the IEP had four benchmarks, with each benchmark aspiring to a progressively higher number of words learned.[2] Tr. at 1055. The PLEP and benchmarks offered J.S.'s educators a method to track his progress. Finally, J.S. was able to identify 44/50 sight words on the sixth grade list by the end of the year. Tr. at 136, 1110. Contrary to the Panel's findings, this demonstrated actual progress.

The Panel also made findings adverse to the District in regard to the math component of the IEPs, finding that it was impossible to measure progress or tell whether J.S. was relearning previously-mastered material. These findings are contradicted by the record, which shows that the sixth grade IEP team measured J.S.'s PLEP and established benchmarks and goals in relation to J.S.'s counting skills. Tr. at 1111. This afforded educators the opportunity to measure J.S.'s progress. Further, Ms. Profita accounted for J.S.'s fifth grade math goals and objectives in creating the sixth grade IEP. Tr. 218-19. Fifth grade skills included goals relating to the use of a calculator, but Ms. Profita determined that the calculator exercises were not true analytical math exercises, but tasks involving following one-step directions. Tr. at 217-18. She thus eliminated

---

[2] J.S.'s seventh grade IEP contained a similar sight word goal list. Tr. at 989.

these exercises from his sixth grade IEP. Tr. at 218. Such responsive program modification is inconsistent with the Panel's findings that the IEPs were created without regard to what transpired in the previous school year.

Like the sixth grade IEP, J.S.'s seventh grade IEP was created with considerable baseline information related to J.S.'s abilities. J.S.'s mother gave considerable input as to J.S.'s needs, participating in IEP meetings on three separate occasions for a total of six hours. Tr. at 312. At his mother's request, the District funded psychological, communication, and reading assessments along with an occupational therapy evaluation. Tr. at 647-48. These evaluations were relied on during formation of the seventh grade IEP. Tr. at 1004. Patrick McCormick, J.S.'s seventh grade teacher, testified that the seventh grade IEP emphasized a "functional academics curriculum." Tr. at 255. This approach emphasized learning to read practical words such as "caution," "poison," "men," and "women." Tr. at 255. Math exercises included counting, money skills, shopping, and budgeting. Tr. at 255. The IEP contained PLEPs, benchmarks, and goals for math, reading, directional skills, communication, physical therapy, and occupational therapy. Tr. at 988-95.

The Panel's determination that the IEPs were formed with little regard to what transpired in previous years is unsupported by the record. To the contrary, considerable effort was applied toward designing IEPs responsive to J.S.'s past educational instruction. The Panel's favored example regarding Ms. Profita's failure to eliminate previously mastered words from the word list is a weak one, as J.S.'s PLEP score proved that the vast majority of words on that list were not mastered. The Panel also failed to mention that J.S.'s sixth grade word list was created only after coordination with the fifth grade teacher and J.S.'s mother, or that Ms. Profita specifically considered the fifth grade IEP in preparing the sixth grade IEP. Four separate assessments of

9

J.S.'s capabilities were conducted and considered prior to the formation of the seventh grade IEP, along with considerable input from his mother. Similarly unfounded is the Panel's conclusion that perceived progress was impossible to measure. Both IEPs were replete with PLEPs, benchmarks, and goals for each subject. The Panel ruled that no progress was demonstrated, but the record showed that J.S. improved in sixth grade from being able to identify six out of 50 sight words to 44 out of 50. He also progressed in math from being able to count in one out of 10 trials to six out of 10 trials with a number line and up to five in three out of 10 trials without a number line. Tr. at 909. In seventh grade, by the time of the due process hearing, J.S. had progressed from identifying 10/15 words in different fonts on index cards to 17/30 words in different fonts.[3] J.S. also had progressed from 50% to 80% in counting up to five with one to one correspondence. Tr. at 272. He was able to count to seven in 8/10 tries with a template. Tr. at 1193. This measured progress suggests the IEPs offered a reasonable opportunity for meaningful educational benefit. The Panel's holding that the IEPs were defective for not including J.S.'s historical progress is therefore without a significant factual basis.

The Panel's legal conclusion that the omission of baseline historical data would render an IEP fatally defective is contrary to law. Although the Third Circuit has yet to address this issue, both the Eighth Circuit and the Sixth Circuit concluded that there is no strict requirement for an IEP to include historical baseline data. In *Lathrop R-II School District v. Gray*, 611 F.3d 419, 424 (8th Cir. 2010), the administrative panel ruled that the school district denied a student FAPE when the IEP failed to include baseline data of the student's previously mastered skills. *Id.* at 424. The Eighth Circuit disagreed, holding that there was no explicit requirement for baseline

---

[3] Mr. McCormick's testimony made clear that the improvement here was measured by J.S's increase in the absolute number of words identified in different fonts, not the percentage of words correctly identified. Tr. at 272-73.

data and it would not compel a school district to put more in its IEPs than required by law. *Id.* It further noted that the IEPs contained present level evaluations that in any case offered a form of baseline data to measure progress. *Id.* Accordingly, there was no FAPE violation. Parents argue that this case is distinguishable, as *Lathrop* applied to a procedural challenge, while theirs is substantive. This is an accurate distinction. However, whether framed as a procedural or substantive challenge, the Eighth Circuit rejected the risk that mastered material would carry over into a challenged IEP as a basis for finding an IEP defective.[4] This leads the Court to believe that such historical baseline data is not a necessary component of an IEP, especially when that IEP had PLEPs from which to measure progress.

Even accepting Parents' argument that *Lathrop* is distinguishable for being a procedural challenge, the Sixth Circuit addressed this issue in the context of a substantive challenge. *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 612 (6th Cir. 2006). The Sixth Circuit ruled that the lack of baseline information did not deny a student FAPE. *Id.* In *Nack*, the school failed to provide PLEPs altogether. *Id.* 611. This was an undisputed procedural violation, but a procedural violation is not a per se denial of FAPE. *Id.* Substantive harm must be further proven. *Id.* at 612. The parents argued that the failure of the IEP to provide a baseline to measure the student's future progress was a substantive harm. *Id.* The Sixth Circuit disagreed, noting that the IEP had short-term objectives that were capable of measurement. *Id.* Further, the student's test results indicated that he derived educational benefits from the IEP as it was implemented. *Id.* For these reasons, the IEP met the substantive requirements of the IDEA. *Id.*

---

[4] The administrative panel was concerned that "[i]f an objective states a student will perform a skill, and the student already knows that skill, mastering that objective would not show any progress." *Id.* These same concerns caused the Panel in this case to determine J.S. was denied FAPE: "[T]here was no investigation from year to year as to whether word lists to be learned included words already mastered during previous years. As a consequence, perceived progress could, in truth, reflect information already learned." Tr. at 1391.

11

The Court finds *Nack's* rationale persuasive. J.S. was not denied FAPE due to the

District's failure to account for words previously mastered. Despite the exclusion of a mastered

word list, J.S.'s IEPs contained short-term benchmarks and yearly goals capable of measurement.

Moreover, J.S.'s IEPs did include PLEPs, giving educators even more information from which to

measure progress than that offered by the IEP upheld as sufficient in *Nack*. Like the student in

*Nack*, J.S. demonstrated improvement. For the 2008-09 IEP year, J.S. improved from identifying

six out of 50 to 44 out of 50 words on his sight word list, progressed in math from being able to

count 1/10 trial to 6/10 trials with a number line and up to five in 3/10 trials without a number

line. In the 2009-10 IEP year, J.S. progressed from identifying 10/15 words in different fonts on

index cards to 17/30 and also demonstrated the ability to form the initial letter sounds in 7/10

trials. In both years, he improved his speech and communications, PT, OT, writing, and the

ability to follow directions. All of this demonstrates that J.S. was not denied the right to FAPE

due to the failure of measurable standards for progress in his IEPs.

**(c) Lack of a Curriculum**

Parents next argue that the Panel correctly ruled that J.S. was denied FAPE due to the

District's failure to establish a "school-wide" and "cohesive" curriculum. It is true that

Meadowood eschewed a formulistic approach to educating special needs students. The IDEA's

focus, however, is not on whether the school implemented a universally applicable curriculum.

To the contrary, the question is whether the District implemented an education plan "specially

designed to meet the unique needs of the child." *Bd. of Educ. of Hendrick Hudson Cent. Sch.

Dist., Westchester County v. Rowley*, 458 U.S. 176, 188-89 (1982). The Act's emphasis on

individualized educational experience is incompatible with the position that a school-wide

curriculum was strictly necessary. "[A]n IEP must be something different than the normal

12

school curriculum and something more than a generic, one-size-fits-all program for children with special needs." *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008).

The Panel's criticisms do go further. The Panel criticized the District's "toolbox" approach, remarking that "the child [was] given a new toolbox with little regard as to which tools the child has already mastered and what tools should be added to the box." The Panel further found that the school district failed to provide a "consistent and meaningful path by which J.S. [could] learn" and that it "lacked this cohesive component." The Panel cited the school's failure to adjust programming to J.S.'s particular needs or vary programming when it was not working. The Panel specifically faulted Mr. McCormick for working with J.S. on phonetic sounds despite the fact that the phonetic approach to reading was "contraindicated." It also found that Mr. McCormick failed to use an established word list.

The Court disagrees with this characterization of the Meadowood program. The record shows that Meadowood sought to implement a specially designed educational plan for J.S. Instead of adopting pre-set programs, the school attempted to tailor lesson plans to J.S.'s individual needs, as called for by the IDEA. Tr. at 246-47, 888-89. Meadowood described this as its "toolbox" method. Tr. at 887-88. Special emphasis was placed on improving J.S.'s practical skills. Tr. at 242, 255, 889. Mr. McCormick described the method as a "functional academics curriculum." Tr. at 255. This curriculum was aimed to enable J.S. to one day achieve independence. Tr. at 242. The school applied Delaware state standards as a basis for instruction. Tr. at 244. Each year, the IEPs were reviewed with meetings of teachers, therapists, and J.S.'s mother. Tr. at 894-95. The school facilitated discussions between the team as to what was successful and what didn't work, the student's needs, and the types of environment most

13

beneficial to the student. Tr. at 895. As discussed, J.S.'s educators customized IEPs to his

abilities and attempted to implement them in order to improve his academic and functional skills.

The end goal was for students to become employable upon turning 21 years old. Tr. at 979.

An extensive team of educational specialists came together in good faith and expended

considerable resources and effort designing an educational program for J.S. Meadowood

professionals acted upon the common philosophy of moving J.S. toward eventual independence

in adulthood. The Panel's specific criticisms are unfounded, including those related to the

inflexibility of Meadowood's approach and the failure to vary the program. For example, in

math, Ms. Profita introduced "manipulatives" into J.S.'s program to help him learn to count,

after determining that J.S.'s ability to count by rote was sufficient, but that he had trouble using

that skill in the practical nature of counting actual objects. Tr. at 139. Ms. Profita further

introduced a number line mid-year into the exercises to assist J.S. with this goal, with the hope

that he eventually no longer would need the number line. Tr. at 139-40. Likewise, the findings

that Mr. McCormick worked on phonetic skills despite phonetics being "contraindicated" and

that he failed to use a core word list are unsupported. Dr. Herzel's cognitive evaluation stated

that J.S. "should be given the opportunity" to use a phonetic-based program. Tr. at 1098.

Further, Mr. McCormick did use a sight word list and discussed the practical nature of the word

list with the Panel. Tr. at 255. To the extent that Parents argue that the District's specifically

implemented educational programs were inappropriate, the Supreme Court has noted that "courts

lack the specialized knowledge and experience necessary to resolve persistent and difficult

questions of educational policy." *Rowley*, 458 U.S. at 206-07. The Court has no expertise in

educational methodology, and does not believe that the IDEA requires second guessing the

special educators' chosen curricular path when it is clear that considerable effort was expended

14

in the path's creation and the path seems plausible. For all these reasons, the Court rules that J.S. was not denied a FAPE due to flaws in curriculum.[5]

**(d) VOD Integration**

Parents also argue that J.S. was denied a FAPE due to Meadowood's failure to integrate his VOD with his classes. For its part, the Panel found that good resources were applied to addressing J.S.'s VOD needs, but that confusion about the school's methodology hindered J.S.'s ability to communicate. Specifically, the Panel remarked, "Profita was unsure as to whether or not the speech/language goals on the October 2008 IEP bore any relation to what was programmed on J.S.'s augmentative communication device." Tr. at 1388. This is a somewhat distorted summation of Ms. Profita's testimony. Ms. Profita testified that she was not sure whether the communication goals were intended to be *measured* with the VOD or through some other form of communication.[6] Tr. at 222. She did not testify that she was unsure as to whether the *content* of the VOD programming was consistent with J.S.'s communication goals. Tr. at 222. To the contrary, the record reflects that Ms. Profita was very familiar with the VOD's implementation as called for by the sixth grade IEP. Ms. Profita learned to program the device herself, as she had accompanied J.S.'s mother to a VOD programming training session in Fall 2008. Tr. at 204-06. The parent and teacher discussed general vocabulary and words necessary

---

[5] The Panel also erred by implying that Meadowood's plan to formulate a new curriculum was evidence of deficiencies in J.S.'s IEPs. The Panel stated, "Testimony that the Meadowood program is now developing a curriculum speaks to their recognition that guidance in building skills in a developmental and/or consecutive fashion is warranted within the program." Tr. at 1391. It was improper to make any negative inference from Meadowood's efforts to improve its instruction. *See Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 479 (4th Cir. 2009). The fact that a school wishes to adjust, or even completely revamp, its curriculum does not necessarily mean that the previous methods were flawed. Courts should not punish schools that attempt to improve their programs by making negative inferences in response to such improvement. *Cf.* Fed. R. Evid. 407 (subsequent remedial measures not admissible to prove deficiencies in prior conduct).

[6] The IEP itself makes clear that J.S.'s communication skills with and without the VOD were to be assessed separately. Tr. at 905-06.

15

for J.S's inclusion classes. Tr. at 147. Ms. Profita also collaborated with J.S.'s speech therapist and further discussed new vocabulary, including words for middle school classes and the names of teachers and students. Tr. at 204. She later brainstormed with the speech therapist for additional programming ideas. Tr. at 204-05. Ms. Profita, J.S.'s mother, the speech therapist, and Debra Young, the assistive technology specialist, all coordinated to ensure that the VOD was appropriately programmed for sixth grade. Tr. at 1215. They attempted to ensure that the device would be implemented effectively during the school day and obtained a computer cable to allow J.S. to complete written expression tasks with the VOD. Tr. at 1215. J.S.'s sixth grade IEP contained a PLEP, benchmarks, and goals purposed towards improving J.S.'s abilities to answer questions and make requests with the VOD. Tr. at 905. Ms. Profita engaged J.S.'s social studies teacher and became familiar with that class's material, obtaining copies of tests to ensure use with the VOD. Tr. at 205. It can be deduced from these facts that Ms. Profita was familiar with the programming of J.S.'s VOD and how the content furthered the realization of J.S.'s educational plan.

Parents argue next that the VOD integration further became deficient once Ms. Profita left on maternity leave. The record shows that J.S.'s mother became concerned that no educator was competent to program the VOD after Ms. Profita went on leave. Tr. at 461. J.S.'s mother contacted Debra Young for assistance. Tr. at 461. Young first taught J.S.'s speech therapist how to program the device. Tr. at 461. J.S.'s mother was dissatisfied with the performance of the speech therapist and again contacted Young. Tr. at 462. This was because the speech therapist programmed the device "one button at a time," as opposed to "whole page programming, meaning 30, 40 buttons on one page." Tr. at 461. J.S.'s mother felt this limited J.S.'s ability to communicate and again complained to Young. Tr. at 461. In response to these complaints,

16

Young coordinated with the school's paraprofessional to further improve programming. Tr. at 462. After this point, J.S.'s mother acknowledged improvement, although she was not happy that programming was still done one button at a time. Tr. at 462.

The VOD was also part of J.S.'s IEP in the seventh grade. Mr. McCormick testified that J.S.'s VOD was incorporated into his class. Tr. at 267-68. The seventh grade IEP had benchmarks and goals for the VOD's use. Tr. at 992. Mark Sprague, speech and language pathologist, testified to working with J.S. daily to implement the seventh grade IEP. Tr. at 860-61. Sprague was involved with programming the device and made customized tests for J.S. based on the material in his science and social studies inclusion classes. Tr. at 859, 863, 866-67. J.S. also completed in-class assignments using the device. Tr. at 1010-11. Debra Young met with educators eleven times to coordinate J.S.'s use of assistive technology. Tr. at 1344. She and Meadowood staff programmed words beyond J.S.'s core vocabulary requirements. Tr. at 1344. In addition, eighth grade regular education students specially tutored J.S. with his VOD. Tr. at 256.

These facts demonstrate the District's substantial commitment to familiarizing educators with J.S.'s VOD and making it a part of J.S.'s educational experience. The Panel's criticisms aimed at Ms. Profita are unfounded, especially considering her personal efforts to help J.S. improve his communication with the device. Ms. Profita's failure to recollect, years after the student-teacher relationship ended, exactly how J.S.'s communications goals were to be measured does not show that she did not significantly contribute to aiding J.S.'s VOD communication skills. Parents criticize the school's use of "one button at a time" method of VOD programming, but the Court is not in a position to scrutinize specific VOD programming techniques. The Court has no ability to recognize the superiority of whole page programming

17

versus one page programming, or to understand whether the distinction is a false one, as argued by the School District.[7] What the Court can recognize is that Meadowood deployed no less than six educators over J.S.'s sixth and seventh grade years to integrate the VOD with his education. This leaves the Court no reason to conclude that the School District's treatment of the VOD device hindered J.S.'s education or denied him FAPE.

### (e) J.S.'s Behavioral Issues and Meadowood's Response.

Parents further argue that J.S. was denied a FAPE due to the School District's failure to provide a Functional Behavior Analysis ("FBA") and to implement a Behavioral Intervention Plan ("BIP"). Parents insist that warning signs of J.S.'s distractibility made apparent the need for specially designed support to assist J.S. to focus and act appropriately during class. The Panel did not find that J.S. was inappropriately denied FBA and BIP, although it did note that Mr. McCormick never discussed behavioral intervention with the school psychologist. The IDEA does not require an IEP to create specific goals with regard to behavior. If a behavior impedes a child's learning, the IEP team need only "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior[.]" 20 U.S.C. § 1414(d)(3)(B)(i). However, "the presence of any problematic behavior does not automatically require a functional behavior analysis under the law." *D.K. v. Abington Sch. Dist.*, 2010 WL 1223596, *9 (E.D. Pa. 2010). The Second Circuit has noted that the decision whether to implement a functional behavioral analysis should be deferred to the expertise of the educational administrators. *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009).

---

[7] The School District cites Young's testimony stating that a person who knows how to program one button can program them all. Tr. at 781.

Parents rely on J.S.'s mother's testimony that J.S.'s distractibility impeded his ability to learn. Tr. at 456. Parents also rely on Ms. Profita's testimony that J.S.'s distractibility in class affected his ability to learn at times. Tr. at 175. Ms. Profita stated that she did not consider J.S. an aggressive child. Tr. at 175. Mr. McCormick testified that J.S. sometimes needed to be "redirected" in his inclusion classes and that at times J.S. enjoyed being the "class clown." Tr. at 273-74. Mr. McCormick implemented various measures to control this behavior, including a time-out in Mr. McCormick's room and regular detention with the general population. Tr. at 274. Mr. McCormick also rewarded J.S. with a leisure period or treats for good behavior. Tr. at 274-75. Mr. McCormick noted that these strategies worked. Tr. at 275. Mr. McCormick further stated that J.S. rarely misbehaved in his special education classroom. Tr. at 286. Dr. Kristen Herzel, pediatric neuropsychologist, conducted an independent educational evaluation at the request of Parents and with the permission of the School District. Tr. at 358. Dr. Herzel examined J.S, but never personally observed J.S. in the classroom and never communicated with the IEP team. Tr. at 365. Dr. Herzel determined that J.S. suffered from severe mental retardation. Tr. at 359. The report noted that J.S.'s distractibility caused him frustration and suggested that behavioral tracking would help understand whether Meadowood's educational programs were effective. Tr. at 368, 373. Dr. Herzel determined this from questionnaires completed by educators and the observations of her assistant. Tr. at 368-69. She never explicitly stated that J.S. needed an FBA. Tr. at 396. Dr. Rhonda Rolfes, school psychologist employed by the District, observed J.S. in the classroom and was aware of his problems with distractibility. Tr. at 109. She testified that the distractibility did not impede J.S.'s learning and that an FBA was not necessary. Tr. at 109-12. Dr. Rolfes noted generally that being distractible does not mean that a student requires a behavior plan or special support. Tr. at 109.

19

The Court holds that J.S. was not denied FAPE due to Meadowood's failure to conduct a FBA or implement a BIP. As noted above, not every behavioral issue justifies official school intervention. The expertise of school administrators deserves due deference in the context of student discipline. The Panel made no findings that J.S.'s distractibility significantly impeded his education. Moreover, the school did not ignore J.S.'s behavioral issues. Mr. McCormick implemented a variety of informal methods to keep J.S. on task and testified to those methods' success. Dr. Rolfes observed J.S. in the classroom and was aware of his problems paying attention. Nevertheless, she determined that an FBA and a BIP were not necessary. This is precisely the type of professional educational judgment to which the Court will defer. The Court holds that J.S. was not denied FAPE due to Meadowood's failure to implement an FBA or a BIP.

**(f) Least Restrictive Environment.**

Parents next argue that the District failed to place J.S. in the Least Restrictive Environment ("LRE"). The IDEA has a "mainstreaming" component, requiring states to establish (to a reasonable degree) procedures to assure that disabled children are educated with children who are not disabled. *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000). "The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995). The Court uses a two-pronged test for assessing compliance with the LRE requirement. First, the Court determines whether "education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1207 (3d Cir. 1993). Factors to be considered in applying this prong include (i) the steps the school

20

district has taken to accommodate the child in a regular classroom; (ii) the child's ability to receive an educational benefit from regular education; and (iii) the effect the disabled child's presence has on the regular classroom. *Id.* at 1215-17. Second, if the Court finds that placement outside of a regular classroom is necessary for the child's educational benefit, it must evaluate "whether the school has mainstreamed the child to the maximum extent appropriate, i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *Id.* at 1215.

Parents argue that the School District did not "provide a continuum of alternative placements" as required by 34 C.F.R. § 300.115(a), instead forcing J.S. into a "one-size-fits-all" program of "community-based vocational training." Parents do not frame their arguments within the confines of the two pronged *Oberti* test. Because Parents do not argue that placement outside of regular education was improper as would be analyzed under the first prong, the Court will analyze the second *Oberti* prong, which asks whether the child was mainstreamed to the maximum extent appropriate. *See Oberti*, 995 F.2d at 1215. Parents argue that J.S. should have been given greater inclusion opportunities.[8] For example, Parents contend that Ms. Profita admitted that the Meadowood program failed to offer J.S. sufficient opportunity to both attend inclusion classes and study functional academics. This is not an accurate summation of her testimony. Ms. Profita actually testified that J.S. should spend more time in the functional academic setting rather than regular education classes to improve his core skills.[9] She disagreed with J.S.'s mother concerning the balance between special education and inclusion classes. Tr.

---

[8] The Court notes that the Parents' counter-claims seek a nonpublic placement that seems to be the antithesis of mainstreaming. The Court does not believe that the parents' choices are relevant to this issue.

[9] "In response to Dr. Rolfes' recommendation that [J.S.] has a need to develop functional academics, I explained to [J.S.'s mother] that I was concerned that he didn't have enough time to work on functional academics in our classroom, and also in community vocational settings because [J.S.] spent a large portion of the school day in regular education settings." Tr. at 132-33.

21

at 133. There was no admission that Meadowood was incapable of adequately meeting J.S.'s educational needs. Regardless, Ms. Profita and Meadowood acquiesced to J.S.'s mother's desire to exclude J.S. from vocational and community classes and to maintain an inclusion-heavy class schedule. Tr. at 133. Six out of seven of J.S.'s sixth grade classes were in regular education. Tr. at 622-23. The trend toward mainstream classes continued in seventh grade, where J.S. attended inclusion classes in social studies, science, art, chorus, regular homeroom and regular cafeteria. Tr. at 256-58. He also worked with peer tutors from the eighth grade regular education classes and had inclusion course materials adapted to his ability. Tr. at 256-58, 1354-55.

Parents point out that J.S. was sometimes denied the opportunity to attend his inclusion classes. J.S. was generally excused from Special Olympics as well as swimming and other community and vocational exercises due to parental wishes. Tr. at 74, 1031-32. J.S.'s mother felt these activities deprived J.S. of valuable direct instruction and preferred that J.S. attend his inclusion classes. Tr. at 467, 486-88, 1032. At times, however, J.S. was left without special education instructors to accompany him to his inclusion classes, as they all departed the school with the bulk of the special education class. Tr. at 74, 1031-32. His mother was specifically informed that there were no guarantees regarding the availability of special education teachers to accompany J.S. to his inclusion classes during these times. Tr. at 977. J.S. would remain behind in the special education classroom with other students to work on his IEP goals with a paraprofessional. Tr. at 134. Parents argue that Meadowood's failure to facilitate J.S.'s attendance of inclusion classes during these times violated his right to education in the LRE. They also object to a community-based instruction trip J.S. attended in seventh grade, where he practiced shopping and mapping skills with other special education students. Tr. at 289-90.

22

None of these events demonstrate that J.S. was denied placement in the LRE. The fact that J.S. occasionally stayed behind in the special education classroom during the program-wide special education field trips does not nullify the significant time he spent in regular education classes. The record shows that, due to parental wishes, J.S. was provided with more inclusion classes than his educators thought appropriate. The fact that J.S. concentrated on his IEP goals rather than attend inclusion classes on occasion seemed an appropriate use of his time, especially considering his educators' concerns about improving his core academic skills. Likewise, the fact that J.S. took a single community exercise trip to the store during summer school does not imply that Meadowood "forced" J.S. to participate in community or vocational based programming to the point where LRE requirements were inappropriately denied. The Court finds that Meadowood made reasonable efforts to include the J.S. in school programs with nondisabled children.[10]

## (g) Reading Specialist.

Parents next argue that that J.S. was wrongfully denied a reading specialist and that the Panel correctly found that former Meadowood principal Mr. Broomall gave "prejudicial" testimony on this topic. These findings are unsupported by the record. The Panel noted Mr. Broomall's testimony that he did not believe J.S. would benefit from a reading specialist as they existed in Delaware. The Panel concluded that this was prejudicial, noting, "This child, J.S., can learn if given the right tools." The Panel's conclusion is apparently premised on the belief that Broomall testified that J.S. was incapable of learning. When viewed in full context, however,

---

[10] The Panel faulted the School District for failing to provide alternative instruction to vocational skills and stated that the School District's treatment of J.S. was "almost punitive." As stated, the record shows that the School District offered considerable mainstreaming opportunity to J.S. Further, nothing in the record shows any animosity or desire of Meadowood educators to punish J.S. To the contrary, the School District officials expended considerable efforts and resources to facilitate J.S.'s mainstream education.

23

Mr. Broomall's testimony did not imply this, as the Panel omitted Mr. Broomall's explanation for his conclusion. Mr. Broomall explained that reading specialists are typically trained to tutor students with learning disabilities such as dyslexia, rather than students with cognitive disabilities. Tr. at 898-99. In Mr. Broomall's opinion, students with cognitive disabilities are better served learning to identify life skills words, which is an area of instruction that is within the expertise of a special education teacher rather than a reading specialist. Tr. at 898-99. Mr. Broomall never testified that J.S. was incapable of learning. The Panel never explained why Mr. Broomall's opinion concerning the limitations of reading specialists was incorrect. There was nothing "prejudicial" or inappropriate about Mr. Broomall's testimony. Further, Mr. Broomall's testimony adequately explains why the School District declined to offer J.S. a reading specialist. This choice did not deny J.S. a FAPE.

### (h) Expert Testimony

Finally, the parties dispute whether Parents' expert witness testimony should be admitted as evidence. Parents submitted the expert report of Dr. Margaret Kay, child psychologist. The School District brings a motion in limine to exclude this report. (D.I. 33). Dr. Kay provided an Independent Educational Evaluation at the school district's expense. Parents' brief, however, only relies on Dr. Kay's report for the purpose of arguing why J.S. should receive private placement at Our Lady of Confidence School. (D.I. 41, pp. 21-29). Because J.S. was not denied FAPE, J.S. is not due any relief under §1415(i)(2)(C)(iii). This makes the question of whether J.S. should be placed at Our Lady of Confidence School irrelevant, along with Dr. Kay's report. The motion in limine is denied as moot.

24

## CONCLUSION

The Court holds that J.S. was provided a free and appropriate public education. J.S.'s sixth and seventh grade IEPs were carefully crafted by Meadowood educators with considerable parental input. They were based on a curriculum aimed toward functional independence and were reasonably implemented, offering J.S. an opportunity to garner meaningful educational benefits. Further, J.S. also showed progress in a number of subjects over these two years. There was no indication that J.S.'s behavioral issues were significant or that a Functional Behavior Analysis was necessary. J.S. was afforded more mainstreaming opportunity than his educators thought warranted, due to parental requests. This undermines the notion that he was denied an education in the least restrictive environment. The District also demonstrated why it did not offer J.S. a reading specialist. For all these reasons, the Court rules that J.S. was not denied a FAPE under the IDEA.

An appropriate order will follow.